NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-3374-14T3

IN THE MATTER OF TANAYA TUKES,
TINA MUCHERSON, TYESHA CUFF,
SARAH PATTERSON, JAYNET PETERSON,
ERICA HENDERSON, NICOLE BUTLER,
TAMARA PEYTON, TRACY BAILEY,
ANDREA JONES, ELIZABETH DUNKLE,
DELORES MCSHAN, FRANCES WILLIAMS,
MILINDA BANKS, TORRIE KING-BRYANT,
ANGELA PLUTA, PATRICIA SHEPPARD,
JACQUELINE SANDERS, LISA SADLER,
SONDRA CROOK, VERA SWAN, AGATHA
DRUMMOND, MARYLIN PARKER, EUNICE
BENNETT, RONNETTE SATTERFIELD,
NANCY FLORES, CLEOPATRA HIBBERT,
WHITNEY TULL, XENIA RIVERA, KIMONA
ANDERSON, CAROLYN RAWLS, LYDIA RAHN,
FRYDAE WILLLIAMS, DONNA LUCKEY,
KYRA HARTZOG, CHRISTINE BAIRD,
TRENITA BETTERSON, TONYA GREEN,
KATHLEEN THOMPSON, MARSHA BAILEY,
MALVINE TRENT, LANESHA JONES, MARYANN
WOOD, CATHERIN LEWIS, KENTHY STREET,
FRANCES WILLIAMS, ROBERTA TRAVIS,
DAWN WRONIUK, JONELLE COPES, BRIAN
BEACHAUMP, NICHOLAS GRUFF, MARY FIFTH,
WENDY FIFTH, BRENDA BROWN, JOHN
PELECHATY, TIFFANY SMITH, CHRISTOPHER
RODRIGUEZ, BARRY JOHNSON, JOSEPH EGBEH,
LATOYA HOLLAND, MILTON WHITE, SUSAN
RIVERA, BRIAN MORROW and DEWAYNE KENT,
DEPARTMENT OF HUMAN SERVICES.[1]

_____

APPROVED FOR PUBLICATION

February 23, 2017

APPELLATE DIVISION

Submitted February 13, 2017 – Decided  February 23, 2017

Before Judges Sabatino, Nugent and Haas.

_____

[1] The case caption used in appellants' notice of appeal has been corrected to include the names of all of the appellants.

On appeal from New Jersey Civil Service Commission, Docket No. 2015-1457.

Weissman & Mintz, LLC and David Beckett Law, attorneys for appellants (Rosemarie Cipparulo and David Beckett, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent Civil Service Commission (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Pamela N. Ullman, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

HAAS, J.A.D.

Appellants, a group of sixty-four Department of Human Services employees (collectively "appellants"), appeal from the February 9, 2015 final agency decision of the Civil Service Commission ("Commission"), which denied their appeal of a determination of their layoff rights by the Division of Classification and Personnel Management ("CPM"). We affirm.

I.

We derive the following background facts from the record. The Department of Human Services ("Department") closed the Woodbridge Developmental Center and privatized the operations of the State-staffed Parents and Friends Association ("PAFA/PAFACOM") homes, which provided services to Department clients with developmental disabilities. As a result, the Department decided to lay off employees in a number of different

job titles, including appellants, who were employed either at the Vineland Developmental Center, the Woodbine Developmental Center, or the PAFA/PAFACOM homes. The following titles were included in the layoff plan: Residential Living Specialist ("RLS"); Cottage Training Supervisor ("CTS"); Head Cottage Training Supervisor; Senior Cottage Training Technician; Cottage Training Technician; Human Services Technician; and Human Services Assistant.

The Department submitted its layoff plan to the CPM for review. Following its review, the CPM approved the layoff plan in its entirety.

As part of its decision, the CPM determined that the RLS and CTS titles were comparable and, therefore, the employees in these titles had "lateral title" displacement or "bumping" rights to each other. In other words, an employee in either the RLS title or the CTS title, who had more seniority than another employee in one of those two titles, could bump the employee with lesser seniority from his or her title. In turn, the "bumped" employee might have "demotional title" rights to an employee in a "lower" title.

As a result of the Departments' layoff plan, twenty-six of the appellants were bumped from their CTS positions by employees in RLS or CTS titles with more seniority. In turn, some of

these appellants bumped other appellants who held lower titles, such as Senior Cottage Training Technician, Cottage Training Technician, and Human Services Assistant. Some appellants in the lowest titles were laid off.

Appellants appealed the CPM's decision to the Commission,[2] which affirmed the CPM's determination in all respects, including its finding that employees in the RLS and CTS titles had lateral title rights to each other. For purposes of their appeal to this court, appellants only challenge the portion of the Commission's decision that concerns the lateral title rights applicable to the RLS and CTS titles. Thus, the issue on appeal is whether the Commission's decision that the employees in these two titles had lateral title rights relative to each other was arbitrary, capricious, or unreasonable. See In re Stallworth, 208 N.J. 182, 194 (2011).

II.

To place that issue in the proper context, we begin by reviewing the law governing employee layoff rights. The Civil Service Act, N.J.S.A. 11A:1-1 to 12-6, provides that "[a]

---

[2] Once the CPM makes an initial determination of layoff rights, an affected employee may appeal to the Commission. N.J.A.C. 4A:8-2.6(a)(2). An appeal from a displacement rights determination does not involve a hearing, but consists of a review of the written record. Ibid. The burden of proof in such an appeal is on the employee. N.J.A.C. 4A:8-2.6(c).

permanent employee may be laid off for economy, efficiency, or other related reason." N.J.S.A. 11A:8-1(a). The Commission is charged with the responsibility for adopting and enforcing rules regarding the order of layoff and the determination of employee layoff rights. Ibid.

Layoffs are to occur in the "inverse order of seniority." N.J.S.A. 11A:8-1(b). For jobs not involving police or firefighting titles, "seniority" is defined as "the length of continuous permanent service only in the [employee's] current permanent title and any other title that has lateral or demotional rights to the current permanent title." Ibid. In the present case, the layoff unit was the Department rather than any of the individual facilities, such as the Vineland or Woodbine Developmental Centers, that it operated. See N.J.S.A. 11A:8-1(c) (stating that "a 'layoff unit' means a department or autonomous agency and includes all programs administered by the department or agency").

As we stated over fifteen years ago in In re Donohue,

> The exercise of lateral or demotional title rights may have a serious impact on other government workers, who may be displaced, as well as on the appointing authority, whose work force may be rearranged. Therefore, layoff rights may be exercised only within the explicitly defined limits of the layoff unit. In addition, the determination of layoff rights requires the application of uniform regulatory criteria

> based upon a careful analysis of job qualifications and duties articulated in the job specifications of the targeted employee, as compared to the job specifications of those titles within the layoff unit to which the targeted individual might have rights.
>
> [In re Donohue, 329 N.J. Super. 488, 497 (App. Div. 2000) (citing N.J.A.C. 4A:8-2.2).

A "demotional title right" is the right of an employee whose title is the target of a layoff to displace "an employee in the layoff unit holding a title determined [by the Commission] to be lower than, but related to the affected title of the employee." N.J.A.C. 4A:8-2.1(b). Permanent employees also have displacement rights to "any title previously held on a permanent basis within current continuous service." N.J.A.C. 4A:8-2.2(f). For these rights, "[d]isplacement may be made only on the basis of greater permanent continuous service . . . ." Ibid. These further rights "shall not be granted when the employee has either lateral title rights options, or demotional title rights options to a title with a higher class code than the previously held title, within the selected job locations." N.J.S.A. 4A:8-2.2(f)(1).

Finally, permanent employees, like the appellants involved in this case, have lateral title rights. A "lateral title right" is defined as "the right of a permanent employee to exercise displacement rights . . . against an employee in the

layoff unit holding a title determined to be the same or comparable to the affected title of the employee." N.J.A.C. 4A:8-2.1(a).

In order for two positions to have lateral title rights to each other, the titles, duties, and education and experience requirements for the two positions do not have to be identical. N.J.S.A. 11A:8-1(e). Instead, the titles need only have "substantially similar duties and responsibilities"; "similar" education and training requirements; and "similar" special skills, licenses certification or registration requirements. Ibid.

In addition, titles may be deemed "lateral" to each other even when an employee who is "bumping" from one lateral title to another has never performed the actual duties of the title to which he or she is moving. Ibid. Thus, one title can be deemed lateral to another when the "employees in [the] affected title, with minimal training and orientation, could perform the duties of the designated title by virtue of having qualified for the affected title[.]" Ibid. (emphasis added).

A lateral title right exists only if the Commission determines that there are titles comparable to the affected title within the layoff unit. The determination of "title

comparability" is made by the Commission based upon four factors:

> 1. The title(s) shall have substantially similar duties and responsibilities and the same class code;
>
> 2. The education and experience requirements for the title(s) are the same or similar and the mandatory requirements shall not exceed those of the affected title;
>
> 3. There shall be no special skills, license, certification or registration requirements which are not also mandatory for the affected title; and
>
> 4. Any employee in the affected title with minimal training and orientation could perform the duties of the designated title by virtue of having qualified for the affected title.
>
> [N.J.A.C. 4A:8-2.1(a).]

### III.

In its thorough written decision, the Commission reviewed the job descriptions for the RLS and CTS titles, applied the four-factor test set forth in N.J.A.C. 4A:8-2.1(a), and determined, like the CPM before it, that the two titles were comparable and that the employees in each of these titles had lateral title rights.

Turning to the first factor, the Commission explained that

> [i]n order to categorize functions and duties which are substantially similar, based on the definition and example of work

portions of job specifications, all titles are slotted into one of the [thirty-nine] occupational groups recognized in the <u>Dictionary of Occupational Titles</u>. Titles are further categorized into occupational families within the occupational groups based on the differences in main functions of titles in each group after further review of the job specification language. Thus, occupational groups and families are utilized as a means of categorizing titles based on assigned duties and responsibilities.

Here, it is undisputed that the RLS and CTS titles were both

in the same class code (13) and occupational group (35 — Direct Care and Related Personal and Health Services). Occupational group 35 includes occupations concerned with attending to the direct treatment, physical comfort, safety, and appearance of individuals placed in government facilities for treatment, rehabilitation, education, or safety. It excludes occupations concerned with criminal incarceration. The titles are also in the same family, Residential Care Services Worker (01).

Thus, the Commission concluded that the RLS and CTS titles had "the same class code." <u>N.J.A.C.</u> 4A:8-2.1(a)(1). The Commission then conducted "a review of the job specifications" for each title and found "that the basic duties and responsibilities of each title are similar" as required by the second prong of <u>N.J.A.C.</u> 4A:8-2.1(a)(1).

The job description for the RLS title defines this title in the following terms:

Under direction of a supervisory official in a small Intermediate Care Facility Unit for the developmentally disabled in a state department, acts as a parent surrogate to clients of that unit providing direct services in the areas of direct care, training, feeding, recreation, education, social education, vocational education, and direct/indirect services in the areas of sanitation and cleaning, laundry, and supportive programming, on the grounds and in community activities; does related duties.[3]

Included in the "Examples of Work" section of the RLS job description are such duties as: "[a]ssumes responsibility for the physical, mental, and emotional well[-]being of assigned clients"; "[p]repares and serves meals to clients, feeds those unable to help themselves, and trains clients to serve and feed themselves where applicable"; and "[b]athes, dresses, combs hair, trims nails, brushes teeth, shaves, and provides whatever other assistance is required by client to ensure adequate standards of personal hygiene."

The job description for the CTS titles defines that title as follows:

Under direction of a Head Cottage Training Supervisor or other supervisor of an

---

[3] The job descriptions for both the RLS and CTS titles both provide that "[t]he examples of work for this title are for illustrative purposes only. A particular position using this title may not perform all duties listed in this job specification. Conversely, all duties performed on the job may not be listed."

institution for the developmentally disabled in the Department of Human Services, supervises cottage personnel assigned to a shift; functions in the absence of the Head Cottage Training Supervisor; conducts assigned non-professional programs for the physical, mental and emotional health of residents, and to develop their potential abilities in areas of personal self-care, social training, cleanliness and related programs; does related work as required.

As "Examples of Work," the CTS job description lists such duties as: "[s]upervises cottage personnel providing for the personal care of residents to ensure proper feeding, cleanliness, safety and well[-]being of residents assigned to a cottage"; "[s]upervises and participates in serving meals to residents and provides assistance to those unable to feed themselves"; and "[p]erforms and supervises staff involved in bathing, dressing, and providing other grooming assistance required by residents for their appropriate personal hygiene." (emphasis added).

After comparing the job duties for the two positions, the Commission found that employees in the RLS and CTS titles were "engaged in para-medical activities" and "participate[d] in . . . support functions such as recreational, vocational, and social programs designed to aid in the care, health[,] and rehabilitation of the physically [ill], mentally ill, or handicapped." The Commission further observed that the two titles "have in common the direct care of clients as their duty

and responsibility."  Thus, the Commission concluded that employees in the RLS and CTS titles performed "substantially similar duties and responsibilities" and, therefore, the criterion set forth in N.J.A.C. 4A:8-2.1(a)(1) had been met.

The Commission next considered N.J.A.C. 4A:8-2.1(a)(2), which concerns the education and experience requirements for each title.  To be assigned to the RLS title, an employee must have "[t]wo (2) years of experience in the direct care of the developmentally disabled in either a residential or community setting."  Similarly, an employee in the CTS title needed "[t]wo (2) years of experience in the direct care of clients which may include training or supervision in an institutional, hospital or residential setting."

The Commission determined that these education and experience requirements were "the same or similar and the mandatory requirements [did] not exceed those of the affected title" under N.J.A.C. 4A:8-2.1(a)(2).  As stated above, the only mandatory requirement for both titles was two years of experience in the direct care of developmentally disabled clients.[4]

---

[4] As noted above, the CTS job description made clear that the required two years of direct care experience for that title could include training and supervisory experience.  However, (continued)

Moving to the third factor, the job descriptions for both titles stated that the only license an employee had to have was a driver's license "if the operation of a vehicle, rather than employee mobility is necessary to perform essential duties of the position." No other special skills, licenses, or other certification or registration requirements were necessary. Thus, the Commission determined that the RLS and CTS titles were comparable under N.J.A.C. 4A:8-2.1(a)(3).

Finally, the Commission found that an employee in the RLS title could perform the duties of the CTS title "with minimal training and orientation." N.J.A.C. 4A:8-2.1(a)(4). While employees in the CTS title performed supervisory duties, no supervisory experience was needed to enter that title. Thus, a person in the RLS title could exercise his or her lateral title rights to the CTS title and then presumably be ready, with minimal training and orientation, to become a supervisor, just as any new employee in the CTS title would.

IV.

Before the Commission, appellants raised three bones of contention that they again present in their appeal to this court. First, appellants argued that the CPM and, thereafter,

_____

(continued)
such experience was not mandated for either the CTS title or the RLS title.

13                                          A-3374-14T3

the Commission failed to "demonstrate a thorough understanding" of the job duties performed by the employees in the CTS title.[5] Specifically, appellants asserted that the Commission did not fully consider the fact that employees in the CTS title were called upon to perform supervisory duties that the employees in the RLS title were not.

However, the Commission expressly acknowledged the supervisory duties performed by employees in the CTS title, and found that that title was still "comparable" to the RLS title as required by N.J.S.A. 11A:8.1(e) and N.J.A.C. 4A:8-2.1(a). The Commission stated:

> [CTS] is not a managerial title, as
> claimed by the appellants, but is a primary

---

[5] In support of their contention that the Commission must "thorough[ly] understand" and fully review the respective job duties of both titles involved in a lateral titles rights case, appellants cite In re Johnson, 215 N.J. 366, 378, 383-84 (2013), a case involving a challenge to the Commission's decision to reclassify a civil service position without first conducting a complete audit of that position. We note that Johnson is inapposite to the case at hand because reclassification decisions are subject to different standards and regulations than lateral title rights cases. See N.J.A.C. 4A:3-3.5 (setting standards for reclassification of positions in the civil service). That having been said, we previously made clear in Donohue, supra, that the determination of lateral title rights must be "based upon a careful analysis [and comparison] of job qualifications and duties articulated in the job specifications" for both positions at issue. Donohue, supra, 329 N.J. Super. at 497. Thus, we have no difficulty adopting here the Supreme Court's common-sense observation that a "thorough understanding" of the duties of a position is necessary in any case where the title rights of a civil service employee are at stake.

level supervisory title, and this is the difference between the [CTS] and [RLS] titles. The [CTS] title is assigned to the "R," or primary level supervisory, bargaining unit, which include[s] titles that <u>may</u> be assigned the responsibility for effectively recommending the hiring, firing, promoting, demoting[,] and/or disciplining of employees in non-supervisory titles. As such, this bargaining unit is defined as permissive for supervisory responsibilities. That is, incumbents may or may not supervise subordinates, or they may supervise a program. Incumbent primary level supervisors are not necessarily required to supervise staff, but the job specification does permit this function if so required by the organizational unit.

Thus, contrary to appellants' argument that it did not "thoroughly understand" the job duties of each position, the Commission specifically recognized that employees in the CTS title were primarily supervisors. However, the Commission went on to explain that the performance of supervisory duties by employees in the CTS title did not affect the overall comparability of the CTS and RLS titles for the purpose of determining lateral title rights. The Commission stated:

The primary level supervisory titles are the titles in which employees can gain supervisory experience, <u>and they are not required to possess supervisory experience upon appointment</u>. As such, aside from the fact that bargaining units are not factored into title rights, primary level supervisors are not differentiated from non-supervisory titles in the determination of title rights. As direct care is the primary focus of each title, they are functionally similar.

A-3374-14T3

[(emphasis added).]

As noted above, the CTS title does not require prior supervisory experience. The employees in this title are only required to have two years of experience in the direct care of clients. Therefore, when an employee enters the CTS title, he or she must undergo a period of "minimal training and orientation" prior to performing any supervisory duties. N.J.A.C. 4A:8-2.1(a)(4).

This would be the same situation where an employee in the RLS title exercised his or her lateral title rights to enter the CTS title. The two-year direct patient care experience requirement for the RLS title is identical to the CTS experience requirement. Thus, with the same "minimal training and orientation," an employee moving laterally into the CTS title could also be expected to perform supervisory functions. Therefore, the Commission concluded that the actual job duties for each title were substantially similar.

Appellants also argued that the RLS and CTS titles could not be deemed comparable because they were in different bargaining units. The Commission addressed and rejected this contention. The Commission stated that the RLS title was "assigned to the "'H'" bargaining unit, Health, Care,

16                                                    A-3374-14T3

Rehabilitation Services[.]"  The CTS title was "assigned to the "'R,'" or primary level supervisory, bargaining unit[.]"

However, as the Commission found, nothing in the governing statute, N.J.S.A. 11A:8-1, or regulations, N.J.A.C. 4A:8-2.1 to -2.6, provides that the bargaining unit for any title must be considered in determining lateral title rights.  Moreover, the Commission reiterated that "the primary focus of each title" was the direct care of clients.  Thus, the Commission concluded that the RLS and CTS titles were "functionally similar" and, therefore, comparable within the intendment of N.J.S.A. 11A:8-1(e) and N.J.A.C. 4A:8-2.1(a).

Finally, appellants argued that the Commission did not adequately consider the fact that employees in the CTS title usually worked in larger State facilities, while employees in the RLS title most frequently assisted clients in smaller group home settings.  Once again, however, the Commission expressly addressed and rejected this assertion.

As the Commission explained, the layoff unit in this case was the entire Department, including all programs, facilities, and group homes managed by the Department.  See N.J.A.C. 4A:8-1.5(a).  The Commission noted that as the appointing authority, the Department had "the right to determine the organization

structure of its operation" and, therefore, could assign employees to various facilities as deemed necessary.

The Commission further observed that "[a]s long as there [were] no improper reporting relationships or misclassifications, how the facility is organized is not under the jurisdiction of the Commission or reviewable in the context of a layoff appeal." Moreover, the experience requirements for both titles did not require that the required two years of direct care experience had to be in any particular facility. Under these circumstances, the Commission concluded that the two titles were comparable regardless of the nature or size of the facility where the employees in the titles had previously been assigned. This appeal followed.

V.

On appeal, appellants contend that the Commission's "final decision is arbitrary, unreasonable[,] and not supported by substantial evidence in the record." As noted above, they raise the three same arguments they unsuccessfully presented to the Commission. Appellants assert that the Commission: (1) failed to demonstrate that it "thoroughly understood" the job duties of the RLS and CTS titles; (2) did not consider that the two job titles were in different bargaining units; and (3) did not give sufficient weight to the fact that employees in the CTS title

18                                                          A-3374-14T3

usually worked in larger facilities than employees in the RLS title. Appellants also add a fourth contention and allege that a search of "title inquiry screens" on an internet database did not reflect the title rights later determined by the Commission. We disagree with all of these contentions.

Established precedents guide our task on appeal. Appellate review of an administrative agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). A "strong presumption of reasonableness attaches" to the Commission's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div.), certif. denied, 170 N.J. 85 (2001). Appellants have the burden to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (holding that "[t]he burden of showing the agency's action was arbitrary, unreasonable or capricious rests upon the appellant"), certif. denied, 135 N.J. 469 (1994).

Appellate courts generally defer to final agency actions, only "reversing those actions if they are 'arbitrary, capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole.'" N.J. Soc'y for the Prev. of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (alteration in original)

(quoting <u>Henry v. Rahway State Prison</u>, 81 <u>N.J.</u> 571, 579-80 (1980)). Under the arbitrary, capricious, or unreasonable standard, our scope of review is guided by three major inquiries: (1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion. <u>Stallworth</u>, <u>supra</u>, 208 <u>N.J.</u> at 194.

When an agency decision satisfies such criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, acknowledging "the agency's 'expertise and superior knowledge of a particular field.'" <u>Circus Liquors, Inc. v. Governing Body of Middletown Twp.</u>, 199 <u>N.J.</u> 1, 10 (2009) (quoting <u>Greenwood v. State Police Training Ctr.</u>, 127 <u>N.J.</u> 500, 513 (1992)). We will not substitute our judgment for the agency's even though we might have reached a different conclusion. <u>Stallworth</u>, <u>supra</u>, 208 <u>N.J.</u> at 194; <u>see also</u> <u>In re Taylor</u>, 158 <u>N.J.</u> 644, 656-57 (1999) (discussing the narrow appellate standard of review for administrative matters).

Applying these principles here, we discern no basis for disturbing the Commission's decision establishing appellants' layoff rights. We affirm substantially for the reasons set

forth in the Commission's thorough written decision and add the following comments.

As they did before the Commission, appellants again allege that the Commission failed to appreciate that employees in the CTS title performed supervisory duties in addition to their direct patient care responsibilities, while their colleagues in the RLS title did not. However, the Commission dealt with this issue head-on in its decision, finding that prior supervisory experience was not a requirement for the CTS title and that to enter either title, an employee only had to have two years of direct patient care experience.

Thus, an employee in the RLS title could laterally move into the CTS title and, just like any other new employee in that position, begin providing supervision as well as direct care "by virtue of having qualified for the affected title" after receiving normal "minimal training and orientation." N.J.S.A. 11A:8-1(e); N.J.A.C. 4A:8-2.1(a)(4). Therefore, the Commission properly determined that the RLS and CTS titles were comparable and that the employees in each title had lateral title displacement rights based on seniority.

Contrary to appellants' contentions, the Commission also considered the fact that employees in the RLS and CTS titles fall under different bargaining units. Again, however, that is

21

a distinction without a difference. An employee's bargaining unit at the time of a layoff is simply not one of the relevant factors that the Commission must consider in determining lateral title rights. N.J.S.A. 11A:8-1(e); N.J.A.C. 4A:8-2.1(a)(4).

The Commission also noted from its exhaustive review of the job titles and duties of the affected employees that individuals holding the CTS title were more frequently assigned to larger facilities than their counterparts in the RLS title. However, the assignment of employees to particular facilities is a prerogative of the Department and does not affect the overall comparability of the two titles.[6] As the Commission found, the supervisory and direct patient care duties performed by the employees were substantially similar regardless of their specific work location.

Finally, appellants assert that prior to the Commission's approval of the Department's layoff plan, information available on a Commission computer database did not list the RLS and CTS titles as having lateral displacement rights to each other. However, when this discrepancy was brought to the Commission's attention, the Commission promptly determined that this error

---

[6] As noted above, the layoff unit in this case was the entire Department, including all programs administered by the Department, and not just one or more of its individual facilities. N.J.S.A. 11A:8-1(c); N.J.A.C. 4A:8-1.5(a).

was "a systems related issue" caused by a "recent department code change made to the CTS title." The Commission attempted "to manually fix the issue but the [computer database] system [was] not permitting any additions." The Commission notified its "systems staff" of the matter, and the proper information was later uploaded to the system.

In the meantime, the Commission made written documentation available to all interested parties concerning the lateral and demotional title rights of all of the titles affected by the layoff. Thus, the mere fact that a computer glitch temporarily prevented the lateral title rights pertaining to the RLS and CTS titles from being available on the database had no impact whatsoever on the Commission's subsequent review and approval of the Department's layoff plan.

In sum, the Commission did not act arbitrarily, capriciously, or unreasonably in determining that employees in the RLS and CTS titles had lateral title rights to each other, and its decision is fairly supported by substantial evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3374-14T3